IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | CASE NO. 09-04089 (ESL) |
| LEIDA OTERO RIVERA | CHAPTER 12 |
| Debtor | |
| LEIDA OTERO RIVERA | ADV. PROC. NO. 11-00043 (ESL) |
| Plaintiff | |
| vs. | |
| LAKE BERKLEY RESORT MASTER ASSOCIATION, INC., THE MANORS AT LAKE BERKLEY HOME OWNERS ASSOCIATION, INC., SRK ASSOCIATION MANAGEMENT, *ET AL.* | |
| Defendants | |

OPINION AND ORDER

This case came before the court on March 21, 2014 for an evidentiary hearing to determine the damages Leida Otero Rivera ("Plaintiff") suffered as a consequence of the Defendants' willful violation of the automatic stay. Partial judgment (Docket No. 58) had been entered for the Plaintiff on the issue of liability after the Defendants Lake Berkley Resort Master Association, Inc., The Manors at Lake Berkley Home Owners Association, Inc. and SRK Residential Communities, LLC, failed to show cause why Plaintiff's motion for partial summary judgment should not be granted on the issue of their liability for the willful violation of the automatic stay provisions (Docket No. 51). The Defendants' default was entered for their failure to show cause (Docket No. 58). The court notes that the Defendants did not appear at the hearing on damages to defend their position. The hearing was held as scheduled. The Plaintiff's testimony, which the court found credible, and the documents submitted constitute the evidence heard by the court.

-1-

Procedural Background

On February 14, 2011, the Plaintiff filed a verified complaint that initiated this adversary proceeding. The Defendants made their first appearance on March 21, 2011, when they requested through local counsel leave to temporarily file pleadings and other documents in physical form (Docket No. 13). On the very same date, the Defendants' stateside attorney applied for admission *pro hac vice* (Docket No. 14). Both requests were granted by the court (Docket Nos. 15 and 16). Also on March 21, 2011, separate *Answers to the Verified Complaint* were filed by Lake Berkley Resort Master Association, Inc., The Manors at Lake Berkley Home Owners Association, Inc. and SRK Residential Communities, LLC. See Docket Nos. 17, 19 and 21, respectively.

Thereafter, multiple requests for the continuance of the pretrial conference were filed, mostly by the parties jointly (Docket Nos. 28, 33, 37, 41 and 47). On October 25, 2012, the court continued the pretrial conference without a date (Docket No. 48). On August 5, 2013, the Plaintiff moved for partial summary judgment against Defendants for their willful violation of the automatic stay (Docket No. 50). On September 5, 2013 the court ordered the Defendants to "show cause within twenty one (21) days why partial summary judgment should not be entered in favor of plaintiff on the issue of liability for having willfully violated that automatic stay provisions" and "scheduling an evidentiary hearing on damages" (Docket No. 51). The Defendants did not reply to the court's order to show cause, and on October 15, 2013, the Plaintiff moved the court to adjudicate the pending motion for partial summary judgment. The motion was granted (Docket No. 54).

Meanwhile, while this adversary proceeding was pending, a hearing was held on November 20, 2013 in the lead case, in which Plaintiff's main bankruptcy case was dismissed in open court due to her failure to make current payments to the Chapter 12 Trustee as per the terms of the confirmed plan. See Lead Case Docket No. 118. The Plaintiff moved the court to retain jurisdiction over the instant adversary proceeding in the lead case and in the instant case. See Lead Case Docket No. 122 and Docket No. 56. The motion pleaded with particularity the

facts leading to the request and included the legal support for the same. On January 21, 2014, the court granted such request in the instant case. See Docket No. 57. On February 11, 2014, the court also granted such request in the lead case. See Lead Case Docket No. 124. The dismissal of a bankruptcy petition does not automatically divest the bankruptcy court of jurisdiction over an adversary proceeding. In re Morris, 950 F. 2d 153 (11th Cir. 1992); In re Carrahar, 971 F. 2d 327 (9th Cir. 1992); Porges v. Gruntal & Co. (In re Porges), 44 F.3d 159, 162 (2nd Cir. 1995); In re Lower Bucks Hosp., 471 B.R. 419 (Bankr. E.D. Pa. 2012); Certain Underwriters at Lloyd's, London v. ABB Lummus Global, Inc., 337 B.R. 22, 25 (S.D.N.Y. 2005) ("[e]ven the dismissal of an underlying bankruptcy case does not automatically strip a federal court of jurisdiction over an adversary proceeding which was related to the bankruptcy case at the time of its commencement"). The bankruptcy court may retain jurisdiction over an action for damages under 11 U.S.C. § 362(k) despite the dismissal of the bankruptcy petition due to a default in payments. See Johnson v. Smith (In re Johnson), 575 F.3d 1079, 1083 (10th Cir. 2009) ("[t]he great weight of case authority supports our conclusion that a § 362(k)(1) proceeding remains viable after termination of the underlying bankruptcy case"). The dismissal of a bankruptcy petition does not validate a violation of the automatic stay. See In re Alfonso, 211 B.R. 508, 513 (Bankr. E.D. Pa. 1997).

On January 21, 2014, the court entered a *Partial Judgment* against Defendants Lake Berkley Resort Master Association, Inc., The Manors at Lake Berkley Home Owners Association, Inc. and SRK Residential Communities, LLC, finding them to have violated the automatic stay provisions of 11 U.S.C. §362(a), and scheduled an evidentiary hearing to be held on March 21, 2014 to determine the extent of the Plaintiff's damages. See Docket No. 58. The hearing was held on March 21, 2014. See Docket No. 61 (*Audio File*).

### Findings of Fact

1. Leida A. Otero Rivera filed a Chapter 12 petition under the Bankruptcy Code on May 20, 2009. See Lead Case Docket No. 1.

2. The Plaintiff was living in the municipality of Aibonito, Puerto Rico, when she filed for bankruptcy.

3. The Plaintiff was in the business of poultry production for the Picú company.

4. The Plaintiff's late husband, Máximo Rodríguez, was also in the business of poultry production with the Plaintiff.

5. When the Plaintiff filed for bankruptcy on May 20, 2009, the Picú company had been closed for two years.

6. Defendant Lake Berkley Resort Master Association, Inc. is a non-profit corporation with standing to sue and be sued. Its address is 6220 South Orange Blossom Trail, Suite 105, Orlando, FL 32809. See Docket Nos. 1, ¶ 6, and 17, ¶ 6.

7. Defendant The Manors at Lake Berkley Home Owners Association, Inc. ("Manors at Lake Berkley HOA") is a non-profit corporation with standing to sue and be sued. Its address is 6220 South Orange Blossom Trail, Suite 105, Orlando, FL 32809. See Docket Nos. 1, ¶ 7, and 19, ¶ 7.

8. Defendant SRK Residential Communities, LLC ("SRK") is a limited liability company organized under the laws of the State of Florida, and Stephen Klosterman serves as its President. See Docket No. 21, ¶ 79.

9. SRK administered both associations.

10. Defendant SRK Residential Communities, LLC voluntarily submitted to the jurisdiction of this Court. See Docket No. 21.

11. The Plaintiff's Chapter 12 Plan was confirmed on June 15, 2010. See Lead Case Docket No. 62.

12. The Plaintiff has owned a residence at the Manors at Lake Berkley HOA since 2003, specifically at 927 Lake Berkley Drive, Kissimmee, Florida 34746.

13. Since approximately 2007, the Plaintiff had leased the referenced property to a woman and her son, both handicapped.

-4-

14. Lake Berkley Resort Master Association, Inc. was generally formed to provide for maintenance, operation, preservation and architectural control of Lake Berkley, a private gated resort community in the State of Florida run by the former, comprising a mixed-use resort community which includes single and multi-family accommodations and recreational facilities.

15. As part of its duties and obligations to the Lake Berkley communities, Lake Berkley Resort Master Association, Inc. is charged with collecting from the communities' annual assessments and charges, or special assessments for capital improvements, to pay the cost of operating and maintaining all administrative functions of the association, among others.

16. The Manors at Lake Berkley is one of the residential communities within Lake Berkley.

17. In 2009, the Plaintiff was being charged approximately $641.00 in fees and assessments every quarter by the Defendants.

18. In addition, in 2008, SRK had imposed a special assessment of $200.00 to offset the lack of funds created by the increasing number of residences under foreclosure.

19. When the Plaintiff filed for bankruptcy, she was current on her payments to the Manors at Lake Berkley HOA, but owed a fee to the Lake Berkley Resort Master Association, Inc., including the $200.00 special assessment which she included in her plan with the Bankruptcy Court.

20. At all times relevant to the above captioned bankruptcy, Defendant Lake Berkley Resort Master Association, Inc. was included as creditor, listed in the master address list and in the list of creditors filed in the Plaintiff's lead bankruptcy case. See Docket Nos. 1, ¶ 21, and 17, ¶ 21.

21. At all times relevant to the above captioned bankruptcy, Defendants Lake Berkley Resort Master Association, Inc. and the Manors at Lake Berkley HOA were informed

and had actual knowledge of the filing of the bankruptcy petition.  See Docket Nos. 1, ¶ 22, and 17, ¶ 22.

22.    On September 21, 2009, Proof of Claims No. 9 and 10 were filed by the Plaintiff's bankruptcy attorney on behalf of Defendants Lake Berkley Resort Master Association, Inc. and the Manors at Lake Berkley HOA, respectively, inasmuch as these Defendants refused to recognize the authority of the U.S. Bankruptcy Court for the District of Puerto Rico.

23.    Before and after the Plaintiff filed for bankruptcy, and in spite of her efforts, the Defendants continued to constantly send her bills charging daily fees of $40.00 or $50.00, which continued to accrue on a daily basis.

24.    The Plaintiff sent e-mails and tried to talk to the Defendants in an effort to reach an agreement, to no avail.

25.    The Plaintiff sent Proof of Claims No. 9 and 10 to both associations more than ten (10) times in an effort to make the Defendants understand that she was under the protection of the Bankruptcy Code.

26.    Between the date of the filing of her bankruptcy on May 20, 2009 and September 21, 2009, when the Proof of Claims were filed for Defendants, the Plaintiff tried many times verbally and through letters to convey to the Defendants the need to file proof of claims, to no avail.

27.    The Plaintiff's bankruptcy attorney sent the Defendants a letter warning them that she was under the protection of Chapter 12 of the Bankruptcy Code.

28.    The Defendants responded with a threat under new Florida statutes, which caused the Plaintiff to live in an emotionally stressful condition for the next couple of years.

29.    The Defendants sued the Plaintiff under these statutes while the Plaintiff was protected by the automatic stay, through the law firm of Charles Ray Maxwell, P.A., seeking a lien on her property at 927 Lake Berkley Drive, Kissimmee, Florida 34746, which at the time

was leased, and the income from that lease was pledged to the Plaintiff's bankruptcy plan and the mortgage.

30. Between the date of the filing of her bankruptcy on May 20, 2009 and September 21, 2009, the Defendants continued to threaten the Plaintiff with collection letters, the aforementioned legal suit and, lastly, they closed the gates until Plaintiff "paid them to the last cent."

31. The property was rented for $1,250.00 to Ms. Beverly Brown, and her son Donald Brown, both handicapped. Ms. Brown is blind, and her son, who has cerebral palsy, is in a wheelchair and requires oxygen. These circumstances required modifications to the property in order to accommodate them.

32. Due to their medical conditions, the Plaintiff's tenants required special services on a daily basis, such as nursing, medicines, breakfast, lunch and dinner, which had to be delivered to them at the property daily.

33. The confirmed plan proposed to pay the Lake Berkley Defendants pre-petition arrears and to continue monthly payments. See Amended Plan dated June 10, 2010, Docket Nos. 58, and 17, ¶ 24.

34. The rental income from leasing the Plaintiff's property at 927 Lake Berkley Drive, Kissimmee, Florida 34746 was disclosed in *Schedule I* and pledged to fund the bankruptcy plan. See Docket No. 1, ¶ 16, and Lead Case Docket No. 1, p. 27.

35. Following the filing of the Plaintiff's bankruptcy petition, the Lake Berkley Defendants and SRK were placed on notice thereof. Ignoring the Plaintiff's notice of the automatic stay in effect, the referenced Defendants continued to serve monthly collection efforts upon the Plaintiff demanding payment of the pre-petition assessments, penalties and interest, which the Defendants continued to assess every month. See Docket No. 1, ¶ 31.

36. The Defendants and their attorney, Charles Ray Maxwell, P.A., were also placed on notice of these filings. See Docket Nos. 1, ¶ 32, 17, ¶ 32, and 19, ¶ 32.

37. The Defendants failed to stop their post-petition collection efforts, and they continued with their collection efforts upon the Plaintiff, demanding payment of the pre-petition amounts. See Docket No. 1, ¶ 33.

38. On or about May of 2010, in an act of defiance and indifference to the Bankruptcy Code and the automatic stay, the Lake Berkley Defendants and SRK commenced to seize the lease payments made by the Plaintiff's tenants, accompanied by affirmative action denying the tenants, the nurses and the outside persons who visited them daily access to the community and placing signs on Plaintiff's property barring access to the leased property. See Docket No. 1, ¶¶ 36-37.

39. In June of 2010, the Plaintiff travelled to Florida because she had been placed on notice by the Florida Sheriff that an emergency had ensued with her tenants because their services and medications were not being allowed entrance into the community, and the State was threatening to take action against the Plaintiff.

40. The Defendants, through Mr. Klosterman, seized the rental monies from the Plaintiff's tenants under the provisions of Florida statutes and placed signs on her property and the community's gate, stating Plaintiff's name, her address and warning that no one was allowed in the property, and if the tenants left, they would not be allowed back in the property.

41. The Defendants intimidated and threatened the Plaintiff's tenants into handing over to them Plaintiff's rental monies for seven (7) straight months.

42. After the Sheriff spoke to Mr. Klosterman, the Plaintiff was allowed into the property, but the latter indicated that no services or vendors for the tenants would be allowed, only the owner.

43. The Plaintiff found that the Defendants had cut the water service to the property and were not allowing or providing maintenance to the property's common areas, such as the pool and mowing green areas. The pool was totally abandoned because the Defendants were not letting anyone in.

44. The Plaintiff felt that the signs placed in front of her property were humiliating, intimating she was a common criminal, when all she had done was file for bankruptcy under Chapter 12 of the Bankruptcy Code.

45. The Plaintiff met with Mr. Klosterman at his office, again with both proof of claims, and tried to explain to him that he was violating the bankruptcy procedures, that it was inhumane for him to treat her tenants like that, who are human beings, just to punish her.

46. The Plaintiff testified that Mr. Klosterman replied that the Florida collection statute did not distinguish between dogs, animals, humans or handicapped, and he would do every effort within reach to collect the amounts due.

47. Mr. Klosterman further reiterated that until the Bankruptcy Court in the Plaintiff's country paid him the last penny, he would not recognize its authority.

48. In September, 2010, the Plaintiff returned to Florida with her husband because her tenants were leaving the property and were holding her liable for all their damages, humiliation and everything that had been done to them.

49. The Plaintiff and her husband personally met again with Mr. Klosterman to resolve the situation once and for all, but Mr. Klosterman matter-of-factly said that they did not recognize the bankruptcy proceeding in the U.S. Bankruptcy Court for the District of Puerto Rico, nor the jurisdiction of this Court.

50. During the September of 2010 meeting, Mr. Klosterman intimidated the the Plaintiff and her husband, laughed at their plea to cease collection efforts and indicated that he "wanted the money" referring to the pre-petition amount owed. He further indicated that he did not care that the tenants were disabled.

51. The Plaintiff felt humiliated and embarrassed because she could not understand how this could happen.

52. The Plaintiff demanded from Mr. Klosterman to state how much she really owed the Defendants because he had been collecting the rental monies for six months, and they also had started to receive payments from her bankruptcy plan.

53. Mr. Klosterman became belligerent and started to shout "pay me". He further reiterated that Proof of Claims No. 9 and 10 had no value for him.

54. A Spanish speaking employee from Mr. Klosterman's office intervened, and he very kindly explained to Mr. Klosterman that Puerto Rico is both a territory and part of the United States, that it is the same federal Bankruptcy Court and that Plaintiff was right.

55. Mr. Klosterman provided Plaintiff an accounts statement, one with zero balance and the other with $1,000.00.

56. A week later, when the Plaintiff was back in Puerto Rico, she received a new bill from Defendants showing the same balances due in dispute; one for approximately four thousand dollars, and the other for approximately two thousand dollars, and, in addition, they seized the rental monies for October 2010.

57. On November 1, 2010, the Plaintiff received a letter from SRK threatening to record a lien against her property and file suit to foreclose the lien 45 days thereafter. See Docket No. 1, ¶ 41.

58. On January 15, 2011, the Plaintiff's attorney sent a letter to all Defendants requesting that all collection efforts cease and that all funds collected in violation of the automatic stay be immediately returned. See Docket Nos. 1, ¶ 51, 17, ¶ 51, 19, ¶ 51, and 21, ¶ 51. Also see Exhibit 3.

59. On or about January 26, 2011, through a letter from Charles Ray Maxwell II, PA, the Defendants had no choice but to return the rents they had seized from the Plaintiff's tenants with the caveat that they had no obligation to do so, but did so only out of good faith. See Docket Nos. 17, ¶ 94, 19, ¶ 94, and 21, ¶ 93. Also see Exhibit 4.

60. Mr. Maxwell enclosed two checks, one for $4,343.35 and the other for $1,537.83. See Docket No. 61, audio file.

61. Following Mr. Maxwell's letter from January 26, 2011, the Plaintiff did not get updated account statements, but the Defendants ceased altogether to provide services to the common areas. See Docket No. 61, audio file.

62. For seven months after the Plaintiff's handicapped tenants left the property, the Defendants did not allow anyone to rent the property.

63. Through letters dated February 1, 2011, that is, five (5) days after the Defendants' attorney had returned $4,343.35 and $1,537.83 in separate checks to the Plaintiff, Mr. Klosterman still claimed that $4,453.03 were due to Masters and $3,226.68 due to Manors. The letters further stated that Mr. Klosterman was acting under the contractual authority afforded to him by the Board of Directors of the Defendants.

64. The Plaintiff's struggles with the Defendants have lasted years, and she has felt humiliated. Further, Defendants' actions not only caused damages to her property, but they forced her to pay for the repairs.

65. The Plaintiff has been emotionally damaged and humiliated by the signs in her property and the Defendants' actions.

Jurisdiction

The court has jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b) and Fed. R. Bankr. P. 7001(1). Moreover, a willful violation claim under 11 U.S.C. § 362 "*must* be brought in the bankruptcy court, rather than in the district court, which only has appellate jurisdiction over bankruptcy cases." Eastern Equipment & Services Corp. v. Factory Point National Bank, Bennington, 236 F.3d 117, 121 (2nd Cir. 2001) (italics in original). Also see Davis v. Courington (In re Davis), 177 B.R. 907, 912 (B.A.P. 9th Cir. 1995) ("The bankruptcy court ha[s] subject-matter jurisdiction over all claims alleging willful violation of the automatic stay."); Halas v. Platek, 239 B.R. 784, 792 (N.D. Ill. 1999) ("[A] Section 362[k] request for sanctions is within the exclusive jurisdiction of the bankruptcy court under § 1334(a)").

Section 101(52) of the Bankruptcy Code includes Puerto Rico as a "state" for bankruptcy purposes, "except for the purpose of defining who may be a debtor under [its] Chapter 9". 11 U.S.C. § 101(52).

-11-

"The provisions of the federal Bankruptcy Code preempt … those state laws that are in conflict with federal law." FDIC v. Torrefacción Café Cialitos, 62 F. 3d 436, 443 (1st Cir. 1995), citing Stellwagen v. Clum, 245 U.S. 605, 613 (1918).  Also see Cipollone v. Liggett Group, Inc., 112 S.Ct. 2608, 2617 (1992) ("state law that conflicts with federal law is without effect").  "Conflict" can occur if "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Ellenwood v. Exxon Shipping Co., 984 F.2d 1270, 1274 (1st Cir. 1993), cert. denied, 508 U.S. 981 (1993), citing California Federal Sav. and Loan Ass'n v. Guerra, 479 U.S. 272, 281 (1987).  "The doctrine of federal preemption is rooted in the Supremacy Clause, which provides that 'the laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution of any State to the Contrary notwithstanding.'" SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 (1st Cir. 2007), quoting U.S. Const. Art. VI, cl. 2.  "Federal statutes and the regulations adopted thereunder have equal preemptive effect." Id., citing Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 159-160 (1982)).  Also see Frykberg v. JP Morgan Chase Bank (In re Frykberg), 490 B.R. 652 (B.A.P. 1st Cir. 2013) (explaining the basic principles of the preemption doctrine and how Massachusetts statutes were preempted by federal law).

In the instant case, any Florida statute that prevents, lacerates or inhibits a debtor's basic right to the automatic stay afforded in 11 U.S.C. § 362 is preempted by the United States Bankruptcy Code, applicable to both Florida and Puerto Rico.

Applicable Law and Analysis

*(A)      The Automatic Stay Afforded in 11 U.S.C. § 362(a)*

"The automatic stay provision is one of the fundamental debtor protections in the Bankruptcy Code." Otero López v. Dep't of Treasury (In re Otero López), 492 B.R. 595, 601 (Bankr. D.P.R. 2013).  It gives the debtor a "breathing spell" from creditors and stops all collection efforts, all harassment, and all foreclosure actions. H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 340-342 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54-55 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5840, 6296-97.  Also see Rodríguez Ramos v. BPPR (In re

-12-

Rodríguez Ramos), 493 B.R. 355, 362 (Bankr. D.P.R. 2013); In re Otero López, 492 B.R. at 601; ICC v. Holmes Transp., Inc., 931 F.2d 984, 987 (1st Cir. 1991); In re Smith Corset Shops, Inc., 696 F.2d 971, 977 (1st Cir. 1982). "It allows the debtor to attempt a repayment or reorganization plan or simply be relieved of the financial pressures that drove him into bankruptcy." ICC v. Holmes Transp., Inc., 931 F.2d at 977.

Section 362 of the Bankruptcy Code provides that upon filing for bankruptcy, a debtor is immediately protected by an automatic stay that prohibits, *inter alia*, the "continuation ... or other action or proceeding against the debtor that was or could have been commenced before the [bankruptcy petition] or to recover a claim against the debtor that arose before the commencement of the case under this title" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case..." 11 U.S.C. §§ 362(a)(1) and 362(a)(6). "The term 'act' is broadly construed to include the failure to stop actions." Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 362.03[8][a] (16th ed. 2012). "This respite enables debtors to resolve their debts in a more orderly fashion and at the same time safeguards their creditors by preventing different creditors from bringing different proceedings in different courts, thereby setting in motion a free-for-all in which opposing interests maneuver to capture the lion's share of the debtor's assets." Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 975 (1st Cir. 1997) (citations omitted).

In the instant case, all pre-petition collection efforts by the Defendants against the Plaintiff were automatically stayed upon her filing for bankruptcy on May 20, 2009 (Lead Case Docket No. 1) under 11 U.S.C. § 362(a). The stay remained in effect until the lead case was dismissed on November 20, 2013 in open court due to the Plaintiff's failure to make current payments to the Chapter 12 Trustee as per the terms of the confirmed plan (Lead Case Docket No. 118).

*(B)    Violation of the Automatic Stay*

The automatic stay imposes on non-debtor parties an affirmative duty of compliance. Sternberg v. Johnston, 595 F.3d 937, 943 (9th Cir. 2010); In re Otero López, 492 B.R. at 607.

-13-

To ensure compliance, Section 362(k) of the Bankruptcy Code provides the necessary means to redress violations of the stay: "an individual injured by a willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and in appropriate circumstances, may recover punitive damages". 11 U.S.C. § 362(k)(1). "A debtor seeking damages under this section bears the burden of proving by a preponderance of the evidence the following three elements: (1) that a violation of the automatic stay occurred; (2) that the violation was willfully committed; and (3) that the debtor suffered damages as a result of the violation." Slabicki v. Gleason (In re Slabicki), 466 B.R. 572, 577-578 (B.A.P. 1st Cir. 2012), citing In re Panek, 402 B.R. 71, 76 (Bankr. D. Mass. 2009). "A willful violation does not require a specific intent to violate the automatic stay." In re Otero López, 492 B.R. at 607. "The standard for a willful violation of the automatic stay ... is met if there is knowledge of the stay and the defendant intended the actions which constituted the violation." Fleet Mortgage Group v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999). "The debtor has the burden of providing the creditor with actual notice. Once the creditor receives actual notice, the burden shifts to the creditor to prevent violations of the automatic stay." Id. at 269. "In cases where the creditor received actual notice of the automatic stay, courts must presume that the violation was deliberate." Id. at 269.

"A violation may also be willful if the creditor's original action in violation of the stay occurred without notice of the bankruptcy filing, but it failed to take prompt action to remedy the violation after receipt of notice." Chapter 13 Practice & Procedure § 5B:6. Also see In re Abrams, 127 B.R. 239, 243-244 (B.A.P. 9th Cir. 1991); In re Combs, 2006 Bankr. LEXIS 3569 at **5-6, 2006 WL 6591825 at *2 (Bankr. N.D. Ga. 2006); In re Smith, 180 B.R. 311 (Bankr. N.D. Ga. 1995) (failure to vacate judgment entered post-petition constituted a willful violation of the automatic stay); Commercial Credit Corp. v. Reed, 154 B.R. 471, 476 (E.D. Tex. 1993) ("[A] creditor must act immediately to restore the status quo once it learns that it has violated the stay."); In re Wariner, 16 B.R. 216 (Bankr. D. Tex. 1981) ("A creditor has an affirmative duty to return the property and restore the status quo once it learns its actions violated the stay."); In re

Miller, 10 B.R. 778 (Bankr. D. Md. 1981) (creditor has an affirmative obligation to return vehicle repossessed post-petition; failure to do so constituted a willful stay violation and supported an award of damages); In re Taylor, 190 B.R. 459, 461 (Bankr. S.D. Fla. 1995) ("once notice was given [to creditor] that the petition relief had been filed, [he] had an affirmative duty to undo the technical violation).

In the instant case, it is undisputed that the Defendants were duly notified of the Plaintiff's bankruptcy petition and were included as creditors, listed in the master address list and in the list of creditors filed in Plaintiff's bankruptcy case. See Lead Case Docket Nos. 1, ¶ 21 and 22; 17, ¶¶ 21 and 22. The Plaintiff filed a Verified Complaint that initiated this adversary proceeding on February 14, 2011 (Docket No. 1). The Defendants made their first appearance on March 21, 2011, and on the very same date, their stateside attorney applied for pro hac vice admission. They further proceeded to file separate Answers to the Verified Complaint (Docket Nos. 17, 19 and 21). Thereafter, multiple requests for the continuance of the pretrial conference were filed throughout, mostly by the parties jointly (Docket Nos. 28, 33, 37, 41 and 47).

The court finds that the Defendants had actual notice of the Plaintiff's bankruptcy petition after they were duly served with notice as creditors. The court further finds that following the filing of the bankruptcy petition, the Plaintiff immediately endeavored in multiple efforts to have the Defendants file their pre-petition claims in the Lead Case to no avail. Specifically, between the date of the filing of her bankruptcy on May 20, 2009 and September 21, 2009, when the Proof of Claims were filed for the Defendants by her attorney in the Lead Case, the Plaintiff tried many times, verbally, through letters, e-mail and telephone calls, to convey to the Defendants that they had to file Proof of Claims and abide by the jurisdiction of this court.

On the contrary, the Defendants, by voice and actions of Mr. Stephen Klosterman, president for defendant SRK Residential Communities, LLC, completely and affirmatively disregarded the jurisdiction of this court with express remarks to that effect. In addition, the

Defendants, unfazed, continued to serve collection notices on the Plaintiff in regards to the pre-petition debts and apply further fees and penalties. Despite having actual notice that Proof of Claims for their pre-petition claims had been filed by the Plaintiff's attorney in the Lead Case, the Defendants egregiously escalated their collection efforts against the Plaintiff. They proceeded to sue the Plaintiff under Florida law seeking a lien on her property at 927 Lake Berkley Drive, Kissimmee, Florida 34746, which at the time was leased, and the income from that lease were pledged to her bankruptcy plan and the mortgage therefor.

Moreover, the Defendants closed the gates to anyone attempting to gain access to Plaintiff's property and/or her tenants until the Plaintiff paid them to the last cent of the pre-petition debt. The Plaintiff's property was rented to a handicapped woman and her son, the former blind and the latter with cerebral palsy, in a wheelchair and who required oxygen. Due to their medical conditions, the Plaintiff's tenants required special services on a daily basis, such as nursing, medicines, breakfast, lunch and dinner, which had to be delivered to them at the property daily.

On or about May of 2010, in an act of complete defiance and indifference to the Bankruptcy Code and the automatic stay, the Defendants commenced to seize the lease payments made by the Plaintiff's tenants, accompanied by affirmative action denying the tenants, the nurses and the outside persons who visited them daily access to the community, and placing signs on the Plaintiff's property barring access to the leased property. The Defendants' actions in violation of the automatic stay caused Plaintiff to travel to Florida in June of 2010 because she had been placed on notice by the Florida Sheriff that an emergency had ensued with her tenants because their services and medications were not being allowed entrance into the community, and the State of Florida was threatening to take action against her.

The Defendants, through Mr. Klosterman, had seized the rental monies from her tenants under the provisions of Florida statutes and placed signs on her property and the community's gate, stating the Plaintiff's name, the address and warning that no one was allowed in the

property, and if the tenants left, they would not be allowed back in the property. The Defendants seized Plaintiff's rental monies for seven (7) straight months.

In addition, the Plaintiff found that the Defendants had cut the water service to the property and were not allowing or providing maintenance to the property's common areas, such as the pool and mowing green areas. The pool was totally abandoned because the Defendant was not letting anyone in. Further, the Plaintiff felt humiliated by the signs in front of her property, like she was a common criminal, when all she had done was file for bankruptcy under Chapter 12 of the Bankruptcy Code.

The Plaintiff met with Mr. Klosterman at his office, again with both Proof of Claims, and tried to explain to him that he was violating the bankruptcy procedures, that it was inhumane for him to treat her tenants like that, who are human beings, just to punish her. Mr. Klosterman replied that the Florida collection statute did not distinguish between dogs, animals, humans or handicapped, and he would do every effort within reach to collect the amounts due. Mr. Klosterman further reiterated that until the Bankruptcy Court in Plaintiff's country paid him the last penny, he would not recognize its authority.

In September of 2010, the Plaintiff was forced to return to Florida with her elderly husband because her tenants were leaving the property and holding her liable for all their damages, humiliation and everything that had been done to them. The Plaintiff and her elderly husband personally met again with Mr. Klosterman to resolve the situation once and for all, but Mr. Klosterman matter-of-factly reiterated that they did not recognize the bankruptcy proceeding in the U.S. Bankruptcy Court for the District of Puerto Rico, nor the jurisdiction of this court. Mr. Klosterman intimidated the Plaintiff and her elderly husband, laughed at their plea to cease collection efforts and indicated that he "wanted the money" referring to the pre-petition amount owed. He further indicated that he did not care that the tenants were disabled. The Plaintiff felt humiliated, embarrassed and impotent, because she could not understand how this could happen.

-17-

The Plaintiff demanded from Mr. Klosterman to state how much she really owed defendants because he had been collecting the rental monies for six months, and they also had started to receive payments from her bankruptcy plan. Mr. Klosterman became belligerent and started to shout "pay me". He further reiterated that Proof of Claims No. 9 and 10 had no value for him. A Spanish speaking employee from Mr. Klosterman's office intervened, and he very kindly explained to Mr. Klosterman that Puerto Rico is both a territory and part of the United States, that it is the same federal bankruptcy court and that the Plaintiff was right. Mr. Klosterman provided the Plaintiff an accounts statement, one with zero balance and the other with $1,000.00. However, a week later, when the Plaintiff was back in Puerto Rico, she received a new statement from the Defendants showing the same balances due in dispute; one for four thousand dollars or so, and the other for two thousand dollars or so, and on top of that, they seized the rental monies for the month of October. Amazingly, on November 1, 2010, the Plaintiff received a letter from SRK threatening to record a lien against her property and file suit to foreclose the lien 45 days thereafter.

On January 15, 2011, the Plaintiff's Lead Case attorney sent a letter, dated January 15, 2011, to all the Defendants requesting that all collection efforts cease and that all funds collected in violation of the automatic stay be immediately returned. On or about January 26, 2011, through letter from Charles Ray Maxwell II, PA, the Defendants had no choice but to return the rents they had seized from the Plaintiff's tenants with the caveat that they had no obligation to do so, but did so only out of good faith. Mr. Maxwell enclosed two checks, one for $4,343.35 and the other for $1,537.83.

Strikingly, through letters dated February 1, 2011, that is, five (5) days after the Defendants' attorney had returned $4,343.35 and $1,537.83 in separate checks to the Plaintiff, Mr. Klosterman still claimed that $4,453.03 were due to Masters and $3,226.68 due to Manors. The letters further stated that Mr. Klosterman was acting under the contractual authority afforded to him by the Board of Directors of the Defendants. The Plaintiff's struggles with the Defendants lasted years, throughout which she has felt humiliated and

-18-

stepped over. Further, the Defendants' actions not only caused damages to her and her property, but they forced her to pay for the repairs caused by their exclusive unlawful actions.

The court concludes that the Defendants' actions constitute a willful and malicious violation of the automatic stay afforded to the Plaintiff when she filed for bankruptcy on May 20, 2009 under 11 U.S.C. § 362(a). The Defendants had actual knowledge that the Plaintiff had filed for bankruptcy, and yet they forged ahead with aggressive and unambiguous actions intended to collect directly from the Plaintiff pre-petition debts due to them. The Defendants' actions are inexcusable and deserve punitive sanctions from this court as a deterrent of any such future reckless conduct. The court also weighs that despite having been aware of the filing of the bankruptcy petition, the Defendants in this case have not restored the Plaintiff to her *status quo* nor have they complied with their affirmative duty to undo their technical violation.

Conclusion

For the reasons stated herein, damages shall be awarded in the Plaintiff's favor due to the Defendants' willful violation of the automatic stay. Consequently, the court finds Defendants jointly and severally liable to the Plaintiff. The court awards the Plaintiff actual damages in the amount of $23,750.00 for lost rent, $2,000.00 for maintenance fees retained, $2,500.00 for travel expenses to Florida, $100,000.00 for emotional damages and $100,000.00 in punitive damages. In addition, the court awards attorneys' fees and costs to the Plaintiff's attorneys for the prosecution of this action, which they will timely request following service of judgment.

SO ORDERED.

Judgment will be entered accordingly.

In San Juan, Puerto Rico, this 29th day of May, 2014.

Enrique S. Lamoutte
United States Bankruptcy Judge

-19-